**FILED**
7/29/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　AUSA Rachel Gurley (312) 353-5370

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

　　　　　　v.

SHADRIC SMITH

CASE NUMBER: 26 CR 413

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 21, 2026, in Chicago, in the Northern District of Illinois, Eastern Division, Shadric Smith violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

　X　 Continued on the attached sheet.

CESAR ESPARZA

Digitally signed by CESAR ESPARZA
Date: 2026.07.29 00:17:49 -05'00'

CESAR J. ESPARZA
Special Agent, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: ____7/29/2026_____　　　__*M. David Weisman*_____
　　　　　　　　　　　　　　　　　　　　　　*Judge's signature*

City and state: <u>Chicago, Illinois</u>　　　<u>M. David Weisman, U.S. Magistrate Judge</u>
　　　　　　　　　　　　　　　　　　　　　*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, CESAR J. ESPARZA, being duly sworn, state as follows:

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately August 2025. My current responsibilities include the investigation of narcotics trafficking offenses.

2.     This affidavit is submitted in support of a criminal complaint charging that SHADRIC SMITH has distributed narcotics, in violation of Title 21, United States Code, Section 841(a)(1).

3.     The facts set forth in this affidavit are based on my personal knowledge, my training and experience, my review of text messages and audio recordings, my conversations with a DEA confidential source, physical surveillance I conducted, information provided to me by other law enforcement agents who conducted physical surveillance, and other evidence from this investigation of which I am aware. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SMITH with distribution of fentanyl, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that SMITH committed the offense alleged in the complaint.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### Summary of Investigation

4.      Since approximately May 2026, DEA, with assistance from the Calumet City Police Department and Lansing Police Department, has been investigating SHADRIC SMITH for suspected narcotics distribution.

5.      In or around May 2026, a confidential law enforcement source (CS-1) reported to law enforcement that SHADRIC SMITH was a distributor of narcotics.[1] Subsequently, at the direction of law enforcement, CS-1 contacted SMITH to arrange and conduct a controlled purchase of narcotics from SMITH.

### July 7, 2026, Sample Delivery of Fentanyl

6.      On or about July 7, 2026, SMITH, using telephone number (708) 752-1197 (the "Subject Phone"), and CS-1 exchanged a series of text messages discussing the delivery of a sample of narcotics from SMITH to CS-1, which was to occur later that day.

7.      At approximately 10:45 a.m., law enforcement officers met with CS-1 at a predetermined meeting location. Law enforcement searched CS-1 and CS-1's vehicle ("CS-1's Vehicle") for contraband, weapons, and money. Law enforcement did not find any contraband, weapons, or money on CS-1's person or in CS-1's vehicle.

---

[1] In January 2024, CS-1 was arrested by law enforcement in possession of approximately two pounds of methamphetamine in McClean County, Illinois. CS-1 is cooperating in the hope of receiving potential sentencing consideration in connection with this arrest. CS-1 has prior convictions for unlawful narcotics distribution, unlawful narcotics possession, unlawful use of a weapon, and various traffic offenses. I believe the information provided by CS-1 set forth in this affidavit is reliable because it has been corroborated in significant respects by other sources of information, such as surveillance and law enforcement monitoring of certain communications by CS-1.

Law enforcement then equipped CS-1 with recording devices but did not provide CS-1 with any pre-recorded funds. Law enforcement maintained constant surveillance on CS-1 and CS-1's Vehicle until CS-1 arrived at the predetermined meet location where s/he had arranged to meet SMITH.

8. According to law enforcement officers conducting physical surveillance, at approximately 11:15 a.m. officers observed a black Dodge Durango bearing Indiana license plate #868EQN (the "Target Vehicle") park in front of the approximate location of 11 157th Street, in Calumet City, Illinois (the "Target Property"), which is a multi-unit apartment building. Per open-source research of vehicle records, the Target Vehicle is not registered to SMITH.

9. At approximately 11:17 a.m., officers conducting surveillance observed SMITH exit the Target Vehicle from the driver's side front door and enter the Target Property through a side door.

10. Two minutes later, at approximately 11:19 a.m., officers conducting surveillance observed SMITH exit the Target Property, enter the driver's seat of the Target Vehicle, and depart from the area in the Target Vehicle. Based on my training and experience and the training and experience of other law enforcement officers with whom I have consulted, my familiarity with this investigation, and conversations with CS-1, I believe that the Target Property serves as SMITH's stash house where he stores narcotics. Further, I believe that SMITH makes frequent stops at the Target Property to maintain only small amounts of narcotics on his person at any given time.

11. Between approximately 11:19 a.m. and 11:53 a.m., law enforcement maintained continuous surveillance of SMITH.

12. At approximately 11:53 a.m., officers conducting surveillance observed the Target Vehicle arrive at the meeting location agreed to by SMITH and CS-1 via text earlier that morning.

13. Officers observed the Target Vehicle park next to CS-1's vehicle. CS-1 then exited his/her vehicle and entered the front passenger's seat of the Target Vehicle.

14. One minute later, at approximately 11:54 a.m., officers observed CS-1 exit the Target Vehicle and re-enter the driver's side front door of CS-1's vehicle. Both the Target Vehicle and CS-1 then drove away.

15. After the handoff, law enforcement maintained constant and uninterrupted surveillance of CS-1 and CS-1's Vehicle until CS-1 arrived back at the predetermined meeting location. Law enforcement conducted a second search of CS-1's person and CS-1's Vehicle at 12:13 p.m., finding no contraband. CS-1 handed to law enforcement the sample that SMITH had provided to CS-1. The sample was a white powdery substance suspected to be narcotics that was contained in a clear plastic bag containing.

16. The bag containing the suspected narcotics that SMITH distributed to CS-1 field tested positive for the presence of fentanyl and weighed approximately 0.28 grams, without packaging. Law enforcement officials submitted the substance to the DEA Laboratory, and the results are still pending.

17. During a subsequent debrief with law enforcement at a predetermined location, CS-1 informed law enforcement that during CS-1's meeting with SMITH, SMITH handed to CS-1 a sample of narcotics and stated, "Have your people check

that out." According to CS-1, SMITH also said to have CS-1's people let him/her know "if they want it" and that they will "like it."

18. According to law enforcement and CS-1, no money was exchanged between SMITH and CS-1 on July 7, 2026. SMITH only provided CS-1 with a sample during the exchange.

### *July 19 and 20, 2026, Agreement to Purchase Narcotics*

19. On or about July 19, 2026, SMITH, using the Subject Phone, exchanged a series of text messages with CS-1 during which SMITH and CS-1 arranged a narcotics purchase.

20. More specifically, on July 19, 2026, CS-1 and SMITH engaged in the following text message exchange:

CS-1: Let me know if you are available tomorrow or Tuesday around 1pm

SMITH: It can't be tomorrow because I have my kid until 5:30 So if you want to do it after that it's cool

CS-1: Ok I will let you know

CS-1: Yooo

CS-1: 100 pieces of chicken for the party

SMITH: Ok

21. CS-1 informed law enforcement that by saying, "100 pieces of chicken for the party," CS-1 meant that s/he wanted to purchase 100 grams of heroin.[2]

---

[2] CS-1 arranged to purchase heroin from SMITH, but the substance s/he ultimately purchased field tested positive for fentanyl.

22. On or about July 20, 2026, at approximately 11:35 a.m., CS-1 sent a text message to SMITH that read, "After 5:30pm I won't be available I will be available tomorrow around 12 pm to 1pm." CS-1 then sent another text message and asked SMITH, "ok for tomorrow," to which SMITH responded, "I should be ok for tomorrow."

23. Later that afternoon, CS-1 sent SMITH a text message that read, "Can you meet me at River Oaks Mall so I don't have to drive across town to meet back with my cousin." SMITH did not respond to this text message.[3]

### *July 21, 2026, Controlled Purchase of Fentanyl*

24. On or about July 21, 2026, between approximately 10:17 a.m. and 10:20 a.m., SMITH and CS-1 engaged in the following text message exchange:

CS-1:      Good morning

SMITH:    What time today is good for you

CS-1:      12 to 1

SMITH:    Let's try for 1:00 River oak

CS-1:      Ok cool

25. Based on my training and experience and the training and experience of other law enforcement officers with whom I have consulted, my familiarity with this investigation, and CS-1, I believe that SMITH waited until less than two hours before the narcotics transaction to confirm the transaction with CS-1 to gauge CS-1's seriousness about and commitment to purchasing narcotics from SMITH. In addition,

---

[3] Based on my training and experience and the training and experience of other law enforcement officers with whom I have consulted, my familiarity with this investigation, and CS-1, I believe that SMITH purposely avoids the use of any narcotics or currency terms in his text messages.

I believe SMITH waited until less than two hours before the transaction to confirm because this gave SMITH the ability to control the time and location of the transaction.

26.     Prior to the scheduled transaction, law enforcement met with CS-1 and provided him/her with $4,000 of Official Advanced Funds ("OAF") for the purchase and equipped CS-1 with a covert audio and video recording device. Law enforcement also searched CS-1 and CS-1's Vehicle for contraband, weapons, and money and did not find any. Law enforcement maintained constant surveillance on CS-1 and CS-1's Vehicle until CS-1 arrived at the predetermined meet location where s/he had arranged to meet SMITH.

27.     At approximately 12:03 p.m., law enforcement agents established surveillance at both the Target Property and the meet location.

28.     At approximately 12:55 p.m., law enforcement agents conducting surveillance observed SMITH driving near the Target Property.

29.     At approximately 12:59 p.m., CS-1 texted SMITH and wrote, "I'm here," to which SMITH responded "[o]n my way."

30.     At approximately 1:38 p.m., SMITH texted CS-1 and asked what store s/he was in front of, to which CS-1 responded with CS-1's location.

31.     At approximately 1:44 p.m., law enforcement officers conducting surveillance observed SMITH arrive in the parking lot of the meet location driving the Target Vehicle.

32. At approximately 1:44 p.m., Officers conducting surveillance observed SMITH park the Target Vehicle next to CS-1's vehicle and observed CS-1 get out of his/her vehicle and into the front passenger's side door of the Target Vehicle.

33. According to CS-1's audio/video recording device, after CS-1 entered the Target Vehicle, the following conversation between CS-1 and SMITH occurred:[4]

CS-1:      Hey yo ass, I ain't got no air on

SMITH:      I got a fucking uh, condo that I bought two years ago, it got brand new air conditioners, two years ago that I never turned on. I just don't fucking use it.

SMITH:      Did you count this?

CS-1:      Yeah

SMITH:      If you counted it, then why do I have to counted for?

CS-1:      You make sure, why don't you want make sure? That's your money

CS-1:      Yo black ass is never on time

SMITH:      Here… a hundred dollars, keep it.

SMITH:      (incoming call from a female caller) Hey, I'll be at the chicken little in like four minutes.

---

[4] This affidavit does not describe every communication between CS-1 and SMITH or every communication by SMITH that CS-1 observed. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review and draft transcripts of the recorded conversations and not on final transcripts of the recorded conversations. These excerpts do not necessarily include all statements or topics discussed during the course of the recorded conversations, nor do quotes summarized in succession necessarily reflect all statements made between the quotes.

34. At approximately 1:57 p.m., law enforcement officers conducting surveillance observed CS-1 exit the Target Vehicle, re-enter his/her vehicle, and drive away.

35. Law enforcement officers followed CS-1 uninterrupted back to a predetermined meet location where, at approximately 2:05 p.m., law enforcement officers met with CS-1 and debriefed the narcotics transaction. CS-1 handed the $100 that SMITH gave her to law enforcement. CS-1 and CS-1's vehicle were searched for contraband, weapons, and money, and none was found.

36. According to CS-1, once s/he was inside the Target Vehicle, CS-1 observed SMITH reach between his legs and retrieve a clear plastic baggie that contained an off-white, chunky substance. CS-1 stated that, simultaneously to SMITH retrieving the bag, CS-1 handed SMITH the $4,000. According to CS-1, SMITH removed $100.00 and gave it back to CS-1, keeping $3,900.00 as payment for the narcotics.

37. CS-1 provided law enforcement with the clear plastic baggie that contained an off-white chunky substance that SMITH had handed to CS-1.

38. The substance CS-1 purchased from SMITH, depicted below, weighed 101.30 grams, including packaging. A field test was conducted on the substance which yielded a presumptively positive result for fentanyl. The substance has been submitted to DEA North Central Laboratory for further testing and analysis.

 

## CONCLUSION

39.     Based on the foregoing, I submit that there is probable cause to believe that on or about July 21, 2026, in Chicago, in the Northern District of Illinois, Eastern Division, SHADRIC SMITH distributed 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide), a Schedule II Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

CESAR ESPARZA  Digitally signed by CESAR ESPARZA
Date: 2026.07.29 00:18:56 -05'00'

Cesar J. Esparza
Special Agent, Drug Enforcement
Administration

SWORN TO AND AFFIRMED by telephone 7/29/2026.

*M. David Weisman*

Honorable M. David Weisman
United States Magistrate Judge